## **CONTINUATION OF APPLICATION FOR SEIZURE WARRANTS**

I, Kimberly A. Singer, being duly sworn, depose and state as follows:

### **INTRODUCTION**

1.       I am a Special Agent for the United States Department of the Treasury, Internal Revenue Service, Criminal Investigation, and have been since April 2004. My responsibilities include investigating criminal violations of the Internal Revenue laws (Title 26, U.S.C.), Money Laundering Control Act (Title 18 U.S.C.), and the Bank Secrecy Act (Title 31, U.S.C.). I graduated from the Federal Law Enforcement Training Center where I received extensive classroom and practical training in financial crimes. I have conducted and assisted in multiple investigations involving violations of tax and money laundering laws, including investigations where the underlying criminal activity is drug trafficking.

2.       This continuation is submitted in support of the government's application for the issuance of seizure warrants for the following vehicles, collectively referred to as the Subject Vehicles:

| Year | Make/Model | Registration | VIN/Serial Number | Registered Owner |
|------|-----------|-------------|-------------------|------------------|
| 2015 | Polaris Slingshot (Subject Vehicle 1) | AZ-113MC7 | 57XAASFA9F5103661 | Jacob Voliner |
| N/A | Exmark Radius E52 Zero Turn Lawnmower (Subject Vehicle 2) | N/A | 404730639 | N/A |
| 1997 | Four Winds Vessel (Subject Vehicle 3) | MI-1507RK | FWNCM110A797 | George Tijernia, Jr. |

Subject Vehicles 1 and 2 were seized on December 1, 2020 during the execution of a search warrant at the residence of DENNIS CARTWRIGHT, as described in more detail below, and are currently in law enforcement custody at the IRS Criminal Investigation impound lot at 24354 King Road, Brownstown, MI 48174. Subject Vehicle 3 is not in the custody of law enforcement, and is in a storage lot in Grand Rapids, Michigan owned by Cutlerville Small Engine and Marine.

1

3.      Based on the facts set forth below, I respectfully submit that there is probable cause to believe that the Subject Vehicles are property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of violations of the Controlled Substances Act, 21 U.S.C. §§ 846, 841(a)(1), and 18 U.S.C. § 1956(c)(7)(D) (concealment money laundering), that have been committed by DENNIS CARTWRIGHT, JAMES MOORE, and others, and are subject to criminal forfeiture pursuant to 21 U.S.C. § 853(a), 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), 28 U.S.C. § 2461, civil forfeiture pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), and subject to seizure pursuant to 21 U.S.C. § 853(f), 18 U.S.C. §§ 981(b), 982(b) by 21 U.S.C. § 881(b).

4.      This application is intended to show merely that there is sufficient probable cause for the requested seizure warrants and does not set forth all of my knowledge about this matter. The information set forth herein is based upon my experience, personal knowledge derived from my participation in this investigation, and upon information received from other law enforcement officers and credible and reliable sources of information.

5.      This continuation is based on a DEA Grand Rapids, DEA Detroit, Kent Area Narcotics Enforcement Team ("KANET"), IRS Criminal Investigation Grand Rapids and the Grand Rapids Police Department ("GRPD") investigation into the drug trafficking, money laundering, and fraudulent loan activities of JAMES MOORE, DENNIS CARTWRIGHT, MYKAEL BOOKER, EILAND JOHNSON, and JEMAR MASON.

6.      Investigators received information that JAMES MOORE[1] was trafficking cocaine

---

[1] JAMES MOORE, a/k/a "Stretch," has State of Michigan convictions for False Pretenses, Disturbing the Peace, Delivery or Manufacture of Cocaine – less than 50 grams (1-27-2014), and Possession of Cocaine – less than 25 grams (1-27-2014). MOORE was also convicted of distribution of 5 grams more of cocaine base on February 20, 2008, in the Eastern District of Michigan and sentenced to 87 months in the Bureau of Prison with 5 years of supervised release. On January 11, 2012, MOORE's supervised release was revoked and MOORE was incarcerated in the Federal Bureau of Prisons. He was released from federal prison custody on June 28, 2018.

and other drugs in the Grand Rapids area. Through electronic and physical surveillance, investigators were able to identify one of his stash locations – 100 Burton Street, Apt #306, Grand Rapids, MI (MOORE RESIDENCE).

7.     Investigators obtained financial documents associated with MOORE. Gun Lake Casino records showed that MOORE gambled more than a million dollars in under one year in a manner indicating that he was attempting to launder drug proceeds into casino winnings. IRS investigators also identified bank accounts held by individually and jointly by MOORE and CARTWRIGHT,[2] as well as their businesses (Muffler Man and Auto Den, respectively).  MOORE and CARTWRIGHT deposited and transferred substantial amounts of cash through these accounts and businesses in a pattern also indicating that they were laundering drug proceeds as legitimate business income.

8.     Investigators obtained Title III wiretap authorization for several phones, including those used by CARTWRIGHT and JEMAR MASON,[3] a drug trafficking associate of MOORE.[4]

---

[2] DENNIS CARTWRIGHT has State of Michigan convictions for Possession of a Short Barrel Shotgun (3-18-2003), Possession of Controlled Substances – less than 25 grams (3-18-2003), Weapons – Firearm Safety Inspection Violation, Malicious Destruction of Building – $200 or more but less than $1,000, and Operating a Vehicle While Impaired.

[3] JEMAR MASON has State of Michigan convictions for Receiving and Concealing Stolen Property – more than $100, Receiving and Concealing Stolen Property – more than $1000 but less than $20,000, Possession of Marijuana, Possession of Methamphetamine/Ecstasy (5-3-2006), Receiving and Concealing Stolen Motor Vehicle, Delivery or Manufacture of Cocaine – 50-449 grams (1-14-2008), Possess of Controlled Substances – less than 25 grams (5-23- 2011 and 4-25-2016) and Delivery or Manufacture Cocaine – less than 50 grams (6-16-2003).

[4] Specifically, Chief Judge Robert J. Jonker, United States District Court for the Western District of Michigan, authorized thirty-day interception periods for each of the Target Phones, which were intercepted for the following periods:
1) August 25 to September 23, 2020: (239) 287-9008 (Target Phone 1);
2) September 23 to October 22, 2020: (616) 291-0050 (Target Phone 3);
3) September 29 to October 22, 2020: (616) 288-8122 (Target Phone 2); and
4) October 23 to November 22, 2020: (Target Phone 2) and (Target Phone 3).
To the extent that there is quoted language in this continuation from consensually recorded telephone

From the intercepts, investigators also learned that in addition to drug trafficking, CARTWRIGHT and MASON were involved in a fraudulent scheme to obtain Paycheck Protection Program (PPP) loans.  Additionally, CARTWRIGHT employs MYKAEL BOOKER[5] as a courier to transport drugs and drug payments between CARTWRIGHT and EILAND JOHNSON,[6] his source of supply in Detroit.

**PROBABLE CAUSE**

**A.  Identification of Phone Numbers.**

9.      During this ongoing investigation, investigators have identified the following phone numbers associated with JAMES MOORE:

a.      616-666-4717 (MOORE PHONE A);[7]

---

conversations or court-authorized interceptions, these quotes are taken from careful review of the conversations as communicated to me by other law enforcement officials. These quotes are still in draft summary format and are not intended to be final transcripts or quotations or a full report of each conversation excepted.

[5] MYKAEL BOOKER has State of Michigan convictions for Carrying a Concealed Weapon (2007), Delivery or Manufacture a Controlled Substance – less than 50 grams (2007), Delivery or Manufacture a Controlled Substance – less than 50 grams (2008), False Report of a Misdemeanor (2010), Use of Marijuana (2010), Home Invasion - Second Degree (2011), Reckless Driving (2014), and Use of a Controlled Substance (2018). BOOKER is currently on probation.

[6] EILAND JOHNSON has State of Michigan convictions for Delivery or Manufacture a Controlled Substance – 50 to 499 grams (1998), Fleeing and Eluding Police (1998), Delivery or Manufacture a Controlled Substance – less than 50 grams (2008), and Manslaughter (2010). JOHNSON is currently on parole.

[7] In January 2020, investigators served numerous administrative subpoenas and searched multiple law enforcement databases, which revealed JAMES MOORE associated with MOORE PHONE A. For example, MOORE registered MOORE PHONE A to his Gun Lake Casino player's card, used the phone number in making airline reservations, and used this phone number in Wal-Mart to Wal-Mart, Money Gram and Western Union money remitting transfers. Further, this phone number's subscriber information is "Car Genie," with an address of 5727 Division Ave. S., Wyoming, Michigan. Car Genie is a business owned and operated by MOORE. On February 11, 2020, a State of Michigan GPS ping warrant was authorized for MOORE PHONE A for 15 days. On March 19, 2020, another GPS ping warrant was authorized for 30 days. On April 16, 2020, another GPS ping warrant was authorized for 30 days. On October 21, 2020, a federal GPS ping warrant was authorized in this district for MOORE PHONE A for 30 days. Over the course of the ping data received,

    b.      616-259-2192 (MOORE PHONE B) (terminated August 18, 2020);[8]

    c.      616-666-1068 (MOORE PHONE C) (terminated May 20, 2020);[9]

    d.      616-828-9892 (MOORE PHONE D).[10]

10.    During this ongoing investigation, investigators have identified the following phone numbers associated with DENNIS CARTWRIGHT:

    a.      616-288-8122 (Target Phone 2);[11]

---

investigators conducted physical surveillance in addition to pole camera surveillance and observed the phone pings to move in conjunction with MOORE's physical movements.

[8] On February 24, 2020, investigators obtained T-Mobile subscriber and telephone toll records for MOORE PHONE B. Investigators conducted a common call analysis between MOORE PHONE A and MOORE PHONE B. According to DEA indices, between January 11 and February 21, 2020, there were approximately 63 common contacts. On March 4, 2020, a State of Michigan GPS ping warrant was authorized on MOORE PHONE B for 15 days. Over the course of the ping data received, investigators conducted physical surveillance in addition to pole camera surveillance and observed the phone pings to move in conjunction with MOORE's physical movements.

[9] In March 2020, MOORE provided MOORE PHONE C as his phone number to a DEA informant.

[10] DEA conducted a common call analysis between MOORE PHONE A, B, and C. DEA served an administrative subpoena to Sprint Corporation requesting subscriber and toll information for telephone numbers 616-706-6864, 616-881-1670, 616-885-8988, 616-890-1922, 616-954-5263, 623-221-7729, 989- 252-1155, and 989-915-8078. According to DEA indices these telephone numbers were in contact with two or more telephone numbers that have been associated with JAMES MOORE during the course of this investigation. According to DEA indices between May 3, 2020, and May 20, 2020, telephone number 616-828-9892 was in contact with approximately 25 common telephone numbers that were also in contact with MOORE PHONES A, B, C, and D. On August 5, 2020, CS2 made contact with MOORE at the Muffler Man at the request of law enforcement. During the meeting, CS2 advised that MOORE provided phone number 616-828-9892 as MOORE's phone number to CS2. Based on the common call analysis and the information provided by CS2, it is believed that 616-828-9892 (MOORE PHONE D) is used by MOORE.

[11] Phone number 616-288-8122 was identified as CARTWRIGHT's phone number in the following manner: Subscriber information provided by AT&T reveals the phone registered to "Auto Den LLC, Dennis Cartwright, 6993 Division Ave S, Grand Rapids, Michigan." A search of common data bases utilized by law enforcement to include CLEAR and TLO revealed "Dennis Cartwright, 7073 Eastern Ave SE, Grand Rapids, Michigan" associated with 616- 288-8122. This is the registered address for CARTWRIGHT per his State of Michigan driver's license.

b.      616-291-0050 (Target Phone 3).[12]

**B. On January 2, 2020, JAMES MOORE orders cutting agents to be delivered to the Muffler Man.**

11.      In April 2020, investigators received JP Morgan banking information pertaining to the Muffler Man (MOORE's business). Investigators found a purchase from bulksupplements.com on January 2, 2020. Investigators found a corresponding purchase confirmation from bulksupplements.com on that date on MOORE's Yahoo email account (obtained by search warrant), which indicated that MOORE used the Muffler Man account to order four kilograms of mannitol powder, shipped to JAMES MOORE at 1246 Plainfield, Ave NE, Grand Rapids, Michigan (Muffler Man Premises). I know from DEA investigators assigned to this investigation that mannitol powder is a common cutting agent utilized as an additive in both heroin and cocaine.

**C. In March 2020, MOORE offers a DEA CS prices for cocaine.**

12.      In March 2020, a DEA CS[13] made contact with MOORE at the Muffler Man Premises, while investigators were conducting surveillance of the shop. Investigators observed the CS arrive at the Muffler Man Premises and enter the shop for approximately 10 minutes.

---

[12] DENNIS CARTWRIGHT was identified as the user of 616-291-0050 in the following manner: A search of common databases used by law enforcement reveals phone number 616-291-0050 is registered to Dennis CARTWRIGHT.  On April 11, 2017 Dennis CARTWRIGHT also provided phone number 616-291-0050 as his phone number to the Kent County Sheriff's Department-reference incident number 17-216832. DEA served an administrative subpoena on AT&T regarding phone number 616-291-0050. Information returned revealed a subscriber of "Auto Den LLC, Dennis CARTWRIGHT, 6993 Division Ave S, Grand Rapids, Michigan."

[13] The DEA CS is cooperating in order to receive monetary consideration. To date, the CS has received $6,500 in compensation. The CS has a criminal record that includes convictions for weapons offenses, larceny, assault excluding sexual, narcotics related offenses, and traffic offenses. The CS's information concerning the DTO has been corroborated by other law enforcement sources and investigative intelligence. The CS has previously provided real time information, conducted controlled purchases, and facilitated buy/busts on multiple federal investigations that have resulted in federal indictments. Investigators have consistently found the CS's information reliable and have not determined any of the CS's information to be untrue.

13.     Upon exiting the Muffler Man, the CS immediately contacted investigators. The CS advised that MOORE informed the CS that MOORE can provide the CS with cocaine, heroin and marijuana. MOORE advised that MOORE would sell the CS a kilogram of cocaine for $32,000.

14.     In March 2020, the same DEA CS contacted JAMES MOORE at the Muffler Man Premises again, while investigators were conducting surveillance. Investigators observed the CS arrive at the Muffler Man and enter the shop for approximately 15 minutes.

15.     Upon exiting the Muffler Man, the CS immediately met with investigators. The CS advised that MOORE provided phone number 616-666-1068 as MOORE's phone number to the CS. The CS further advised that MOORE instructed the CS to only contact MOORE via Facetime in order to avoid law enforcement from intercepting phone calls. MOORE informed the CS that MOORE had two different types of cocaine available. MOORE offered the CS "good" cocaine for $800.00 per ounce and "never stepped on" cocaine for $1,300 per ounce. MOORE informed the CS that MOORE had recently provided JEMAR MASON with a kilogram of the "good" cocaine and told the CS to not purchase narcotics from MASON because the CS would be able to get a better price by going directly through MOORE.

**D.  JAMES MOORE, RICHARD ANDERSON, and BRITNEY YSASI Travel to Phoenix, AZ and Los Angeles, CA to Obtain Marijuana.**

16.     On April 26, 2020, James MOORE, Richard ANDERSON and Britney YSASI traveled from Grand Rapids, Michigan to Mesa, Arizona. Upon arriving in Arizona, DEA Phoenix observed MOORE, ANDERSON and YSASI obtain two rental vehicles, which they drove to California.

17.     On April 27, 2020, DEA Los Angeles initiated surveillance on MOORE, ANDERSON and YSASI as they arrived in Los Angeles, California. MOORE and ANDERSON

met with Joshua HESTER and Deandre DANTZLER in the parking garage of the Circa LA Apartments and conducted a suspected narcotics transaction. DEA LA made contact with HESTER and DANTZLER and seized a suitcase and backpack that contained seven plastic bags of suspected marijuana and approximately $17,480 US currency. During a post-*Miranda* interview of HESTER, HESTER advised he had sold 8-10 lbs. of marijuana to MOORE and ANDERSON for approximately $10,000.

18.     On April 28, 2020, a Maricopa County Sheriff's Office (MSCO) officer observed a black Dodge Charger bearing a Washington License plate: BPX-4126 driving eastbound on I-10 in Arizona in tandem with the other rental vehicle driven by MOORE and ANDERSON. The MSCO officer observed the black Dodge Charger cross over the gore area while merging onto SR85 South. The MSCO officer conducted a traffic stop of the black Dodge Charger and made contact with the sole occupant and driver of the vehicle, Britney YSASI. While conducting the traffic stop, an MCSO K9 unit arrived on scene.

19.     The MSCO K9 officer conducted an open-air sniff around the vehicle, which resulted in a positive indication for narcotics. A search of the vehicle resulted in the seizure of approximately 1.2 pounds of marijuana, located within the spare tire compartment in the trunk. The MSCO officers further seized $1,469 US currency from her purse and an Apple iPhone from YSASI's person. YSASI was released.

20.     A State of Arizona search warrant was authorized by the Honorable David Seyer of the Maricopa County Superior Court for YSASI's Apple iPhone. YSASI's last outgoing phone call while being pulled over was to "Stretch" (MOORE's known alias) on phone number associated with MOORE.

21.     On April 30, 2020, members of GRDO DEA and MET established surveillance at the Grand Rapids Airport. At approximately 2:25 p.m., investigators observed MOORE, YSASI

and ANDERSON exit an Allegiant flight returning from Mesa, Arizona. Investigators observed MOORE claim three bags from baggage claim: a silver suitcase, and two black suitcases. YSASI and another man (Armond BURRIS) who was waiting at the airport left with two of the claimed bags in a black SUV.

22.     Investigators observed MOORE and ANDERSON, with one black suitcase, walk over to the rental car terminal. Airport Police officers confirmed that MOORE rented a silver Impala, at approximately 3:05 p.m.

23.     Surveillance continued with the silver Impala as it exited the airport grounds. At approximately 3:38 p.m., investigators observed the silver Impala arrive at Muffler Man Premises. Investigators observed MOORE and ANDERSON exit the vehicle and enter the shop. At approximately 3:49 p.m., MOORE exited the shop holding a small object in his hand and enter the driver's seat of the silver Impala. At approximately 3:50 p.m., ANDERSON exited the shop and entered his black Chevy Tahoe. At approximately 3:51 p.m., both vehicles exited the parking lot.

24.     Surveillance continued with both vehicles as they drove in tandem to Moore Residence. At approximately 4:08 p.m., the silver Impala parked on Francis Ave SE, the street east of Moore Residence parking lot and the black Chevy Tahoe park in the parking lot of Moore Residence. MOORE and ANDERSON entered the front door of the apartment building.

25.     At approximately 4:19 p.m., Armond BURRIS' black Lexus SUV arrived in the parking lot of Moore Residence and parked. MOORE and ANDERSON exited the apartment building and made contact with BURRIS. BURRIS retrieved a black suitcase out of the rear passenger side door, as well as a brown parcel and a white parcel. MOORE carried in the brown parcel, ANDERSON carried the white parcel and BURRIS carried the black suitcase into the front door of Moore Residence.

26.     At approximately 6:26 p.m., ANDERSON and MOORE exited the front door of

Moore Residence. At approximately the same time, JEMAR MASON drove into the parking lot in a black GMC Yukon XL. MOORE walked to the driver's side window of MASON's vehicle. MOORE obtained something from MOORE's right jacket pocket and handed it through the window to MASON. MOORE then walked away from MASON's vehicle and entered the apartment complex. At approximately 6:29 p.m., MASON's vehicle exited the parking lot.

27.     Based on my training and experience, as well as the ongoing investigation, I believe that MOORE, YSASI, and AERSON transported narcotics in the suitcases to Grand Rapids, which they then left at Moore Residence, a stash location for the MOORE DTO. Further, I believe that he sold a portion of those narcotics to MASON in the parking lot of Moore Residence.  As detailed below, MASON is a known drug trafficker.

**E.  On July 31, 2020, a narcotics canine indicates positive on a luggage bag belonging to JAMES MOORE.**

28.     On July 31, 2020, MOORE returned to Grand Rapids, Michigan, from a trip to Nashville, Tennessee. At approximately 9:00 p.m., members of GRDO DEA, MET and GRPD Vice established surveillance at the Grand Rapids Airport.

29.     At approximately 10:15 p.m., GRPD Officer Wise and K-9 Rico were in the airport baggage receiving area. K-9 Rico is certified in drug detection, excluding marijuana. VICE officers pulled four bags off the cart from the flight MOORE flew in on and lined the bags up approximately 4 feet apart from each other. VICE officers advised Officer Wise that they believed one of MOORE's bags was in the line-up of the four bags. Officer Wise had no prior knowledge of which bag belonged to MOORE. Officer Wise took K-9 Rico up to the bags and let K-9 Rico walk around them but did not give K-9 Rico the command to search yet. Officer Wise advised he could see a change in behavior in K-9 Rico and K-9 Rico went to the black bag and indicated on it. Officer Wise then commanded K-9 Rico to search all four bags and K-9 Rico only alerted on the black bag, indicating the presence of narcotics. Investigators returned all four bags and they

were placed on the baggage carousel. Surveillance observed MOORE retrieve the black bag from the carousel.

30.     At approximately 10:25 p.m., investigators observed MOORE enter the parking garage lot, enter the driver's seat of a black Audi sedan and exit the parking garage. Investigators observed the black Audi exit the airport garage and drive westbound on 44th Street. Investigators observed MOORE traveling at a high rate of speed and continue northbound on Breton Road SE. MOORE abruptly turned into the parking lot of Keyboard World located on the corner of 28th Street and Breton Road SE. Investigators observed MOORE pull into a parking spot briefly before exiting the Keyboard World. Due to MOORE's high speed travel, surveillance was unable to observe MOORE following his exit from Keyboard World.

31.     At approximately 10:40 p.m., investigators observed MOORE's vehicle northbound on Madison Ave. At approximately 10:45 p.m., investigators observed MOORE's vehicle arrive at Moore Residence and pull into the parking lot. At approximately 10:46 p.m., investigators observed via a pole camera MOORE entered the front door of the apartment building for Moore Residence, wheeling the same black bag behind him.

32.     Based on the ongoing investigation, my training and experience, the positive canine alert, physical surveillance and pole camera footage, I believe that MOORE traveled to Nashville, Tennessee in order to obtain narcotics which he brought back to Michigan in the black bag. I believe that MOORE was using "cleaning" techniques in order to evade law enforcement during his travel from the airport to Moore Residence. Further, I believe that he stored the narcotics in the black bag in Moore Residence, a stash location for the MOORE DTO.

**F.  August 5, 2020, recorded phone call between a DEA CS and MOORE.**

33.     On August 5, 2020, the DEA CS placed a recorded FaceTime phone call to MOORE on MOORE PHONE D for the purpose of obtaining cocaine:

MOORE:      What up fooly?

CS:         My   dog.   What   it   do?

MOORE:      What's up? What's up baby?

CS:         Can I talk to you real quick?

MOORE:      Yeah, you good.

CS:         Man you can't make nothing shake for me on the soft?

MOORE:      I ain't been having none, bro.

CS:         I know man, me either man. But man my people just came around and I was trying to kill them one time.

MOORE:      Yeah.

CS:         Damn man.

MOORE:      I ain't been fucking with the Mexicans, the numbers are high.

CS:         I knew it. Fuck man. I might have to find a different route. I was hoping you could help me my dog.

MOORE:      No, you know if I could help you my nigga yous… yous be looking at the raw special.

CS:         I know that I know that.

MOORE:      Yeah ---- [unintelligible] that pandemic shit. I might have had some work a couple times, but my man is in Indianapolis with that shit. As soon as it came around, that shit kinda got played out. I was like I'm straight fuck that shit ya know nigga sent me some bullshit. I'm killing it bro. I ain't gonna lie to you. I told him I swear to god it's going to be return to sender. I swear to god to you bro.

CS:         Right right right.

MOORE:      I'm calling a nigga [unintelligible] yeah bro, I'll wait a day or two. Let me get that again. He come back and I'm flat now.

CS:         That's the way to do it too because you know they are going to go right for the money. Greedy motherfuckers don't even think twice.

MOORE:      Bro listen some shit, me and my cousin we hit a nigga like that one April Fool's day. I'll never forget man, I was in the uh, I was in the 11th grade. April Fools I swear to god. Same way man. Nigga had played my cousin. Shit. I didn't do it. I was young. My cousin did that shit. My other cousin.

CS:         Right right right.

MOORE:      They known. They called that nigga up and said April Fools. Nigga it was

$15,000 and a half a chip. And it was more than that because they took the nigga's money out of the truck too. Don't bring that bullshit around here. 11th street on the east side too? Crazy as fuck.

CS:         Alright man I'm driving man. I finna try and find a route. MOORE:

You gotta find a route? How nobody around here [unintelligible].

CS:         Alright my nigger well if you hear anything you let me know dog.

MOORE:   Yeah if I get some around I'll call you and let you know.

CS:         Alright fosho.

MOORE:   Alright bet.

34.     Based on my training and experience, the ongoing investigation and this recorded phone call, I believe that MOORE was informing the CS that he currently did not have any cocaine, which is commonly referred to as "soft." I believe when he stated, "I ain't been fucking with the Mexicans, the numbers are high," MOORE was referring to his Mexican source of supply and advising that he was not currently obtaining cocaine from them because the prices were too high. I further believe that when MOORE discussed the cocaine, he obtained from Indianapolis he was explaining to the CS that it was poor quality cocaine.

**G. On October 2, 2020, a narcotics canine indicates positive on a luggage bag belonging to JAMES MOORE.**

35.     On October 2, 2020, DEA Grand Rapids received information that MOORE was returning on American Airlines ("AA") flight 2440 from Los Angeles, California, to Chicago O'Hare airport. At approximately 7:50 p.m. (CST) DEA Chicago observed the luggage from AA Flight 2440 as it was offloaded from the flight. DEA Chicago located a large blue hard-sided suitcase, which had a luggage tag with the name MOORE/JAMES on it. DEA Chicago transported the suitcase to an area on the tarmac adjacent to the gate K18.

36.     DEA Chicago placed the suitcase in an area of the tarmac that contained concrete barriers as well as other equipment associated with the tarmac and ramp areas. TFO Terranova

directed K9 Madden to conduct an off-leash sniff of the area. K9 Madden alerted to the presence of a controlled substance odor emitting from the blue hard-sided suitcase.

37.     After the canine alert, the suitcase was taken to carousel 6 at the baggage claim level. The suitcase was placed on the belt and sent to the general claim area. DEA Chicago observed MOORE retrieve the large blue hard-sided suitcase and leave the airport terminal with it. DEA Chicago also observed MOORE retrieve a large silver bag that apparently belonged to an unknown female.

**H.  EILAND JOHNSON offers narcotics to DENNIS CARTWRIGHT.**

38.     On September 22, 2020, the Honorable Robert J. Jonker, Chief Judge of the United States District Court for the Western District of Michigan, authorized the interception of wire and electronic communications occurring to and from Target Phone 2, used by DENNIS CARTWRIGHT. On September 29, 2020, the Honorable Robert J. Jonker, Chief Judge of the United States District Court for the Western District of Michigan, authorized the interception of wire and electronic communications occurring to and from Target Phone 3, used by DENNIS CARTWRIGHT. The interception of Target Phone 2 and Target Phone 3 pursuant to this order concluded on October 22, 2020.

39.     On October 23, 2020, the Honorable Robert J. Jonker, Chief Judge of the United States District Court for the Western District of Michigan, authorized the interception of wire and electronic communications occurring to and from Target Phone 2 and Target Phone 3, used by DENNIS CARTWRIGHT. The interception of Target Phone 2 and Target Phone 3 terminated on November 21, 2020.

40.     On October 1, 2020, at approximately 3:48 p.m., CARTWRIGHT, using Target Phone 3, had a call (Call #579) with JOHNSON, using phone number 419-901-1927 (JOHNSON

PHONE A).[14]

| | |
|---|---|
| CARTWRIGHT: | What's happening? |
| JOHNSON: | You wanna see me right now nigger. Guaranteed. |
| CARTWRIGHT: | Yeah? Where you at? |
| JOHNSON: | Down the D. |
| CARTWRIGHT: | Oh, what's going on with you man? Man it's crazy man. My cousin got the same motherfucking zip, uh, area code man. |
| JOHNSON: | Fosho. That's what's real. |
| CARTWRIGHT:<br>JOHNSON: | Yeah. Shit, what's going on with you?<br>Shit. Uh 18 a zip, 54 for the whole book. Straight from them. |
| CARTWRIGHT: | Okay. |
| JOHNSON: | You hear what I said? |
| CARTWRIGHT: | Yup, yup. That's it, you said 64? |
| JOHNSON: | Yup. 54 for the whole thing, for you I'll do 53. |
| CARTWRIGHT: | Okay. Let me make a call. |
| JOHNSON: | And then, uh 17 for you, I'll do 17 a zip. |

---

[14] EILAND was identified as the user of phone number 419-901-1927 in the following manner: On October 13, 2020, the user of phone number 419-901-1927 advised CARTWRIGHT he was in Grand Rapids during Call #1597. CARTWRIGHT then requested that the user of 419-901-1927 come to his house. The user of 419-901-1927 advised that it would take him 16 minutes to get there. Approximately 15 minutes later, surveillance observed a Honda Accord, bearing MI plate: ECU1982 pull into the driveway and park. This vehicle is registered to EILAND JOHNSON. While at CARTWRIGHT's house, CARTWRIGHT, using **Target Phone 3**, placed a phone call (Call #1611) to an unknown male, using phone number 616-799-1295. During the call, JOHNSON began speaking to the unknown male on CARTWRIGHT's phone. The unknown male stated, "Bro…when the fuck you get back?" JOHNSON stated, "I be back home a year and a half now man." The unknown male stated, "Oh straight up." JOHNSON replied, "I be here two years officially, uh, uh, April the ninth, three days before my birthday." According

| CARTWRIGHT: | Okay. Let me call, let me make a quick call. |
| JOHNSON: | Okay. |
| CARTWRIGHT: | Alright. I'mma hit you back. |

41.     Based on my training and experience, and the intercepted phone call between CARTWRIGHT and JOHNSON, I believe that JOHNSON called CARTWRIGHT to inform him that he had narcotics for sale. I know from DEA investigators assigned to this investigation that "zip" is slang for an ounce of drugs and that "book" is slang for a kilogram of drugs. I believe JOHNSON was talking in code and informing CARTWRIGHT that he was selling ounces of drugs for $1,800 per ounce and kilograms for $54,000.00.

## I.  MYKAEL BOOKER obtains narcotics from EILAND JOHNSON and delivers them to DENNIS CARTWRIGHT.

42.     On October 11, 2020, at approximately 6:54 p.m., CARTWRIGHT, using Target Phone 3, had a call (Call #1396) with BOOKER, using phone number 616-594-6948 (Target Phone 5).[15]

| BOOKER: | What up. |
| CARTWRIGHT: | Yeah, when, yeah, shit when you making that move? |
| BOOKER: | Shit, I'll probably leave in the morning, now that he called. |
| CARTWRIGHT: | Yeah, yeah. Okay, alright cool. |
| BOOKER: | Alright. |
| CARTWRIGHT: | But just tell him that then. You out first thing |

---

[15] MYKAEL BOOKER was identified as the user of phone number 616-594-6948 in the following manner: Investigators subpoenaed Sprint PCS/T-Mobile regarding phone number 616-594-6948, which revealed a subscriber of MYKAEL BOOKER. Investigators queried phone number 616-594-6948 in TLO, which revealed the phone number to be associated with MYKAEL BOOKER.

|  | in the morning. Then, you know, we just gotta get together, that's it. |
|---|---|
| BOOKER: | Alright, hey I told him that, I don't know. |
| CARTWRIGHT: | Yeah, well he, I think he a little confused. |
| BOOKER: | Ain't no telling man. I'm finna, he, he, gonna be calling me. I'm probably finna call him right back. |
| CARTWRIGHT: | Yeah, he just called, he said, yeah, he said, "I'm gonna call." I said, "You ain't got to, I'll call him." He said he was gonna call you to tell him to call me. Yeah. Yeah, I think he was a little confused. Yeah, I told him, I said, "Shit, I'm ready whenever he is." Shit. |
| BOOKER: | Alright yeah. That's what I told him. Shit, I said, "Well shit, whenever he calls." Shit. |
| CARTWRIGHT: | Man, see that's what he sa- that, you know what, that's what he said though. He was like, he said, he was waiting on me to call…and I was like…see, he, he mixed, he mixed… |
| BOOKER: | [Unintelligible] |
| CARTWRIGHT: | Yeah, he mixed all that up. Cause he was like, really like, "yeah, whenever-yeah, whenever he was ready, you ready. Yeah, tell him to be down there first thing in the morning. Let's do it." But yeah, I think he got a little confused, maybe… that's it. |
| BOOKER: | Yeah, yeah, yeah. |

43.     On October 12, 2020, at approximately 12:23 p.m., CARTWRIGHT, using Target Phone 3, had a call (Call #1455) with a BOOKER, using Target Phone 5.

| CARTWRIGHT: | Shit, what's happening? |
|---|---|
| BOOKER: | What up though? Shit, I was just calling, he said, "Call you in like thirty minutes." And I'm just calling, let you know he said he was gonna, um, go all the way this time. You |

17

|   |   |
|---|---|
|   | know? |
| CARTWRIGHT: | Okay. |
| BOOKER: | But, whenever, just call me when you ready. I'mma uh… |
| CARTWRIGHT: | Yeah, I'm re-, I mean, I'm ready. Uh,  where you at? |
| BOOKER: | I'm in Wingate right now. |
| CARTWRIGHT: | Okay. |

*Later in the conversation*

|   |   |
|---|---|
| CARTWRIGHT: | When you, uh getting ready to, uh, when… you just gonna call me when you on your way? |
| BOOKER: | Yeah, I'm finna get in the shower, put my clothes on and I'm finna, uh, be on my way. I'mma come, uh, bumping into him. I'mma just get on the highway out there. |

44.    Based on the ongoing investigation, my training and experience and the intercepted calls, I believe that CARTWRIGHT had agreed to buy narcotics from EILAND JOHNSON and that BOOKER was going to retrieve them for him. I believe that in these two phone calls, CARTWRIGHT and BOOKER were discussing the timing of that deal. BOOKER mentioned being at Wingate. Wingate is an apartment complex in Kentwood, Michigan where BOOKER lives.

45.    At approximately 12:30 p.m., members of DEA Grand Rapids established surveillance on the 6993 Division Avenue South, Grand Rapids, Michigan (Auto Den Premises). Upon arriving, surveillance observed CARTWRIGHT, BOOKER and two unknown white males at the auto shop. For approximately the next hour and a half, surveillance observed CARTWRIGHT and BOOKER go in and out of the Auto Den Premises multiple times. At approximately 2:11 p.m., surveillance observed BOOKER enter a black Jeep, bearing Michigan

Plate: DYQ3670. A query of this plate resulted in no record found. Investigators continued surveillance on BOOKER's vehicle as it left the Auto Den Premises and headed northbound on Division Ave. Surveillance observed BOOKER use multiple cleaning techniques such as abruptly turning around and using side streets to double back, which resulted in surveillance losing BOOKER.

46.     Upon losing BOOKER on surveillance, members of DEA GRDP re-established surveillance on the Auto Den Premises. At approximately 2:52 p.m., surveillance observed BOOKER arrive back at the Auto Den Premises and meet with CARTWRIGHT on the front porch briefly before entering the building together. At approximately 3:03 p.m., surveillance observed BOOKER exit the Auto Den, re-enter his black Jeep and exit the parking lot by cutting through a neighborhood located behind the Auto Den Premises. Surveillance was unable to re-locate BOOKER in the neighborhood or the surrounding area and was terminated.

47.     On the same date, at approximately 8:44 p.m., CARTWRIGHT, using Target Phone 3, had a call (Call #1503) with BOOKER, using Target Phone 5.

| | |
|---|---|
| CARTWRIGHT: | What's up, big money. |
| BOOKER: | What up though? Hey. |
| CARTWRIGHT: | Yeah. |
| BOOKER: | I just made it. I, uh, who it be? That, that, the normal plan? |
| CARTWRIGHT: | Yeah. |
| BOOKER: | Alright. |
| CARTWRIGHT: | You wanna, I mean, you wanna do that or you wanna… you… what you gonna do? You wanna… you wanna go, uh, you wanna meet me first thing in the morning or what? |
| BOOKER: | It's up to you. I ain't tripping. |
| CARTWRIGHT: | I ain't doing shit but watching the game. |

| | |
|---|---|
| BOOKER: | Yeah, I ain't tripping. I ain't gonna lie though. Uh, majority of it… he had it in zips. I ain't gonna lie. |
| CARTWRIGHT: | Oh okay. |
| BOOKER: | Other than like, other than probably like, three, other than like three hundred, four hundred grams. |
| CARTWRIGHT: | Yeah, yeah. Why, we'll, yeah, we'll just meet in the… we'll just meet in the morning, then. |
| BOOKER: | Alright, alright. |

48.    Based on my training and experience, the intercepted phone call between CARTWRIGHT and BOOKER, and the preceding surveillance, I believe that in this call BOOKER informed CARTWRIGHT that he had returned from picking up the drugs and that they were divided into ounces ("zips"), other than 300-400 grams. BOOKER agreed to meet CARTWRIGHT the next morning to give him the drugs.

49.    On October 13, 2020, members of DEA Grand Rapids and the Grand Rapids Police Department Vice Unit established surveillance on the Auto Den Premises and CARTWRIGHT's home at 7073 Eastern Ave, Grand Rapids, Michigan (Cartwright's Residence) at approximately 7:30 a.m. At approximately 9:35 a.m., surveillance observed CARTWRIGHT exit his house and enter a Lexus sedan bearing a dealer plate. At approximately 9:40 a.m., surveillance observed CARTWRIGHT arrive at the Auto Den Premises.

50.    On the same date, at approximately 9:56 a.m., DENNIS CARTWRIGHT, using Target Phone 3, had a call (Call #1519) with MYKAEL BOOKER, using phone number Target Phone 5.

| | |
|---|---|
| BOOKER: | Hello? |
| CARTWRIGHT: | Yeah? |
| BOOKER: | Hey, hey, where you at? |

20

| CARTWRIGHT: | I'm at the…I'm at the lot right now. |
| BOOKER: | When you wanted me to come to? I had to motherfucking, do this detox thing. The drop, for my, uh court services, for that accident. Man, I, I, was supposed to drop yesterday. |
| CARTWRIGHT: | Oh, so what you got…you gotta go take care of that? |
| BOOKER: | No, I already went to go, uh, do the detox thing, but I had to set up for an appointment. She ain't have appointments still. So, I gotta wait. Anyway, that's why I woke up and shot down. Drop downtown and then come with you, but she ain't have no motherfucking openings anyway. |
| CARTWRIGHT: | So, what you gonna do? You gonna wait? Or you coming through? |
| BOOKER: | Nah, I'm finna leave right now. I'm finna, I'm, I'm just now pullin' up to Wingate. I'm finna grab it and leave. |
| CARTWRIGHT: | Alright, well I'm here. |
| BOOKER: | Alright. |

51.     Based on my training and experience, and the intercepted calls, I believe that BOOKER was telling CARTWRIGHT that the he had stored the drugs from JOHNSON at Wingate Apartments (either Booker Residence 1A or Booker Residence 2B), and that that he would bring them to CARTWRIGHT at Auto Den Premises ("I'm just now pullin' up to Wingate. I'm finna grab it and leave.")

52.     At approximately 10:30 a.m., surveillance observed a silver GMC Terrain bearing North Carolina Plate: HEW-2994 arrive at the Auto Den Premises and park directly behind the black Malibu. A query of this plate indicated that this vehicle belonged to Avis car rental. Surveillance then observed BOOKER exit the silver GMC Terrain and enter the Auto Den with CARTWRIGHT and another man.

53.     Based on the preceding interception (Call #1519), I believe that BOOKER delivered the drugs that he got from JOHNSON on October 12 to CARTWRIGHT at the Auto Den

Premises.

54.     On October 13, 2020, at approximately 8:08 p.m., CARTWRIGHT, using Target

Phone 3, had a phone call (Call #1591) with JOHNSON, using JOHNSON PHONE A.

| | |
|---|---|
| JOHNSON: | I'm trying to let you know I was up here. I told boy, Booker to get in touch. |
| CARTWRIGHT: | Oh shit I ain't even know that. |
| | *Later in the conversation* |
| JOHNSON: | I'll call you when I'm leaving here and then I'll come bump into you. |
| CARTWRIGHT: | Alright, well, yeah, so shit. |
| JOHNSON: | Okay. |

55.     Based on the ongoing investigation, my training and experience, I believe that

JOHNSON was advising CARTWRIGHT that he was in Grand Rapids, Michigan and that he

wanted to meet.

56.     On the same date, at approximately 8:36 p.m., CARTWRIGHT, using Target Phone

3, had a phone call (Call #1598) with JOHNSON, using phone number 419-901-1927. During the

call, JOHNSON informs CARTWRIGHT he will be at CARTWRIGHT's house in 16 minutes.

57.     On the same date, at approximately 8:45 p.m., DEA Grand Rapids established

surveillance at Cartwright's residence.

58.     On October 13, 2020, at approximately 8:50 p.m., CARTWRIGHT, using Target

Phone 3, had a phone call (Call #1608) with BOOKER, using Target Phone 5.

| | |
|---|---|
| CARTWRIGHT: | Shit, hey, did you, uh, did you give him… did you give him some paper? |
| BOOKER: | Shit, none of my peoples ain't never even come grab them. I had left them cause I was try'na leave. They ain't never even come grab none of this shit. |
| CARTWRIGHT: | Okay, no big, so you ain't give nothing, did you? |

BOOKER:                Uh, nope, nope, nope. Not on, not on that, no.

CARTWRIGHT:            Okay.

BOOKER:                And I still got the what's it's names too though.

CARTWRIGHT:            Yeah, yeah, I know. That's cool. No biggie, I just didn't
                       know. So…

BOOKER:                But if, but if he… you, uh, you already went this far. So,
                       we, you gotta tell me what you, uh you know what I'm
                       saying? What we discussed.

CARTWRIGHT:            Yeah, yeah, yeah. For sure. I got it, yeah. I will.

BOOKER:                Alright man.

CARTWRIGHT:            Shit, I was just wondering if you gave, yeah, I mean, I got
                       some change for him anyways. He ain't gon', he ain't gon'
                       leave sad.

BOOKER:                Yeah, no, no, no, he ain't gonna be sad anyway.

CARTWRIGHT:            Yeah.

BOOKER:                That nigga happy right now.

CARTWRIGHT:            Nah, nah, he def-…yeah. He definitely ain't gonna be sad
                       and if he is, I'll give his ass a lollipop.

59.     At approximately 9:00 p.m., surveillance observed a Honda Accord, bearing MI

plate: ECU1982 pull into the driveway at Cartwright's residence and park. This vehicle is

registered to JOHNSON. Based on the ongoing investigation, my training and experience, the

intercepted phone calls described in this affidavit, I believe that JOHNSON was the source of the

drugs that BOOKER picked up for CARTWRIGHT. I believe that CARTWRIGHT paid

JOHNSON for the drugs while he was in Grand Rapids with drug proceeds that he had at

Cartwright's residence ("give him some paper," "I got some change for him" and JOHNSON is

"happy right now.")

23

**J.  MYKAEL BOOKER provides a Narcotics payment to EILAND JOHNSON on behalf of DENNIS CARTWRIGHT and obtains further narcotics.**

60.     On October 19, 2020, the Honorable Judge Ray Kent, U.S. Magistrate Judge of the Western District of Michigan authorized a federal GPS tracker warrant for BOOKER's silver GMC Terrain for 30 days. On the same date, the tracker was installed by investigators. Approximately 1 hour after installation, investigators reviewed the tracker data, which revealed the vehicle had been returned to Avis. On October 20, 2020, investigators went to Avis to retrieve the tracker from the silver GMC Terrain with the assistance of an Avis manager. The Avis manager alerted investigators that there was a digital scale in the front driver's door pocket. Investigators seized the scale and conducted a field test of the digital scale with a cocaine wipe, which tested positive.

61.     On the same date, Avis advised investigators that the silver GMC Terrain had been swapped out for a gray Dodge Durango, bearing IL plate: E918648. The vehicle was rented by Aliyah Walker, who listed her residence as Booker Residence 1A.

62.     Investigators have seen BOOKER come and go from Booker Residence 1A regularly and believe that he lives there with Walker.  Investigators have also surveilled BOOKER regularly coming and going from a second Wingate apartment – Booker Residence 2B.[16] Based on intercepted calls and surveillance detailed below, investigators believe that he is using both Wingate locations to store and sell narcotics. On October 20, 2020, at approximately 8:30 a.m., DENNIS CARTWRIGHT, using Target Phone 3, had a call (Call #2075) with MYKAEL BOOKER, using phone number 616- 594-6948.

CARTWRIGHT:              Yo?

---

[16] Although the door to Booker Residence 2B is inside of the apartment building, the front of the building is glass so investigators have been able to see BOOKER come and go from this specific unit.

BOOKER:                          What up, though?

CARTWRIGHT:                 Shit, what's happenin'?

BOOKER:                          Man, shit… Shit, just try'na bump into you.

CARTWRIGHT:                 A'right.

BOOKER:                          When you is, uh, when you is free?

CARTWRIGHT:                 Oh, shit, like… shit, probably in like a hour.

BOOKER:                          In a hour? A'right.

CARTWRIGHT:                 Yeah.

BOOKER:                          A'right, I'm finna drop my son off and shit. I'll pull up, uh, where you want me… you want me to come to the, to, uh…

CARTWRIGHT:                 Yeah, yup.

BOOKER:                          A'right.

CARTWRIGHT:                 Hey, uh, you still got the, uh, you still got your buddy that, uh, can make them stubs?

BOOKER:                          Can make some stubs?

CARTWRIGHT:                 Yeah, them little check stubs.

BOOKER:                          Oh, yeah, yeah.

CARTWRIGHT:                 A'right, cause my bid dog try'na get a vehicle for my aunt at Berger. I don't know what he gon' need yet, but he probably gon' need some.

BOOKER:                          Some type of check stub?

CARTWRIGHT:                 Yeah.

BOOKER:                          Uh, I, I'll just pull up on dog and get the number. Cause old girl I get it from, her daddy just got killed a couple days ago. So, she probably ain't…

CARTWRIGHT:                 Okay, well whatever, he don't, he ain't gon' get off 'till four. So, uh, I gotta figure out what it, uh, what, uh… what he probably, what he gon' need in the numbers, but… He

|            | asked me… |
|------------|-----------|
| BOOKER: | A'right. |
| CARTWRIGHT: | … I'm like, shit. You know, it's kinda hard if you gon' apply for a ca-, car and you try'na get a loan and you… want your paycheck to come from a dealership. They kinda look at it a little funny. |
| BOOKER: | Yeah, hell yeah. Shit, I'mma get this little nigga ready to drop him off for school. |
| CARTWRIGHT: | A'right, just hit me when you, uh, when you out movin'. I probably be out here within' a half an hour, or somethin'. |
| BOOKER: | A'right. |
| CARTWRIGHT: | Yup. |

63.     Based on the ongoing investigation, my training and experience, and the intercepted phone call, I believe that BOOKER agreed to provide CARTWRIGHT with fake pay stubs that CARTWRIGHT's aunt could use in applying for a car loan. CARTWRIGHT and BOOKER agreed to meet.

64.     On October 20, 2020, surveillance was established at the Auto Den Premises. At approximately 9:30 a.m., CARTWRIGHT, using Target Phone 3, had a call (Call #2098) with BOOKER, using Target Phone 5. During the call, CARTWRIGHT told BOOKER that he would meet him shortly. At approximately 9:36 a.m., surveillance observed MYKAEL BOOKER arrive at the Auto Den Premises in a gray Dodge Durango bearing Illinois registration: E918648.

65.     At approximately 9:44 a.m., surveillance observed BOOKER exit the driver's door of the Durango wearing a tan jacket and enter the passenger side door of a blue Lexus bearing Michigan registration: D14911.  Investigators have observed DENNIS CARTWRIGHT to use this blue Lexus daily.

66.     At approximately 9:45 a.m., CARTWRIGHT, using Target Phone 3, had a call

(Call #2100) with BOOKER, using phone number 616-594-6948.

| | |
|---|---|
| BOOKER: | You in the, you in the office? |
| CARTWRIGHT: | No, I'm in the house. |
| BOOKER: | Oh, oh, a'right, yeah. |
| CARTWRIGHT: | Yup. |

67.     At approximately 10:00 a.m., surveillance observed BOOKER exit the Lexus and enter the driver's door of the Dodge Durango. Surveillance observed the Durango exit the Auto Den Premises northbound onto S. Division Ave.

68.     At approximately 10:03 a.m., surveillance observed BOOKER pull into the Big Lots parking lot, near the intersection of 54th St SE/S Division Ave.  At approximately 10:14 a.m., surveillance observed the Durango drive northbound through the parking lot and park in front of a liquor store. At approximately 10:16 a.m., surveillance observed a black Dodge Journey with a Florida plate, pull up door to door with BOOKER. Surveillance observed the drivers of both vehicles talking for several minutes.

69.     At approximately 10:22 a.m., surveillance observed the Dodge Journey leave the parking lot and drive westbound on 54th St SE.  Surveillance attempted to catch up to the Journey, but lost sight of it as it entered the northbound US-131 onramp.

70.     At approximately 10:22 a.m., BOOKER's Durango exited the liquor store parking lot eastbound onto 54th St SE. A short time later, surveillance was at the intersection on 54th St SE/S Division Ave and observed the Durango heading westbound on 54th St at S Division Ave. Investigators were unable to locate the Durango after he crossed the intersection westbound.

71.     At approximately 10:50 a.m., surveillance observed the gray Durango parked in front of Booker Residence 1A. At approximately 11:07 a.m., the Durango exited the parking lot of Booker Residence 1A and continued westbound on Wingate Dr. SE, then westbound on 44th St

SE. Surveillance lost sight of the Durango near the intersection of 44th St SE/Stauffer Ave SE.

72.     At approximately 12:30 p.m., surveillance observed the gray Durango parked in front of Booker Residence 1A. At approximately 12:40 p.m., surveillance observed a black Cadillac Escalade pull up next to the gray Durango. Surveillance observed a passenger exit the Escalade and walk toward the Durango.

73.     At approximately 1:05 p.m., CARTWRIGHT, using Target Phone 3, had a call (Call #2111) with BOOKER, using Target Phone 5.

| | |
|---|---|
| CARTWRIGHT: | Yo? |
| BOOKER: | What up, though? |
| CARTWRIGHT: | Shit, down here at the other lot, movin' some shit around. What's happenin'? |
| BOOKER: | Hey, uh, cause I had talked to dog, man. He told me he's like, needing me to come. I ain't know what you wanted me to do on, uh… what you wanted me to tell him, type shit. He told me to call you. |
| CARTWRIGHT: | [UNINTELLIGIBLE]… Hold on, so what are you, what, what… what are you 'bout to do? |
| BOOKER: | I mean, I can, uh, I, I mean shit. All I can do is take him the cheese I got. I ain't got no extra cheese to buy more. |
| CARTWRIGHT: | You said what? |
| BOOKER: | I said, all I'm doin' is takin' him the cheese I got, for the shit. You feel me? I ain't got, I ain't buyin' nothin' else. It ain't, you feel me? Ain't no extra cheese for it right now. |
| CARTWRIGHT: | Yeah, I don't either, yet… I'm… |
| BOOKER: | Shit. |
| CARTWRIGHT: | … I'm, you know… I'm still waitin' on, uh, a couple things to shake. |
| BOOKER: | [UNINTELLIGIBLE]. |

| | |
|---|---|
| CARTWRIGHT: | Yeah. |
| BOOKER: | Well shit, I don't know. Shit, I'mma, uh… I don't know, I'mma, uh… I'm at least shootin' [AUDIO BREAK] 'cause I told him I was done with it. So, that's really why he callin' me, for that, for that four. |
| CARTWRIGHT: | Okay. |
| BOOKER: | So, I'mma, uh… I'mma, uh, just hit [AUDIO BREAK] get a chance to grab that. So, I can at least shoot that. You said you would get on him in a couple days, or somethin', right? |
| CARTWRIGHT: | Yeah, that's cool. |
| BOOKER: | [UNINTELLIGIBLE]. |
| CARTWRIGHT: | That ain't nothin', let me know when you… when you leavin' out? |
| BOOKER: | I gotta go get, uh, gotta go grab my son. I mean I'm just finna grab my cousin's son. Then, shit, I'll probably get on the road in 'bout an hour. No later than a hour. |
| CARTWRIGHT: | A'right, just give me like a, give me like twenty minutes before you comin' my way. |
| BOOKER: | A'right, a'right, a'right. |
| CARTWRIGHT: | A'right, yup. |

74.    Based on the ongoing investigation, my training and experience, the intercepted phone call, I believe that BOOKER was preparing to travel to Detroit, Michigan in order to provide a narcotics payment to their source of supply, JOHNSON. They both agreed that they did not have extra money to buy additional drugs from JOHNSON ("I ain't got no extra cheese to buy more" and "I don't either).

75.    At approximately 1:20 p.m., surveillance observed the Escalade depart the Booker Residence 1A parking lot. At approximately 1:21 p.m., investigators observed BOOKER exit the gray Durango and walk toward Booker Residence 1A.  Investigators observed BOOKER go down

the stairs that lead to BOOKER's specific apartment unit.

76.    At approximately 1:25 p.m., investigators observed BOOKER exit Booker Residence 1A and enter the driver's side of the gray Durango. BOOKER exited the apartment complex westbound. At approximately 2:30 p.m., investigators observed the gray Durango pull into the Auto Den Premises.

77.    At approximately 2:34 p.m., CARTWRIGHT, using Target Phone 3, had a call (Call #2126) with BOOKER, using Target Phone 5.

| CARTWRIGHT: | Yo. |
| --- | --- |
| BOOKER: | Hey, Den. Where you wanted me to come to? |
| CARTWRIGHT: | Yo. |
| BOOKER: | Where you wanted me to come to? |
| CARTWRIGHT: | Uh, [STATIC] uh, I was gone meet you back at the lot. Where you at now? |
| BOOKER: | That's where I was pulling up to. |
| CARTWRIGHT: | Yeah, I had to run and grab a key, uh, from, uh, damn, uh, uh, from Berger's, so I'm just leaving… I'm just really leaving there right now, man. The traffic was crazy. Where, where you at? |
| BOOKER: | Shit, I'm right here on Division and, like, fifty-second. |
| CARTWRIGHT: | Oh, you… You at… You with your… By yourself? |
| BOOKER: | Yeah, I'm by… Then I'm… That's what… That's what took me so long. I had to make sure I was dropped there by [UNINTELLIGIBLE] before I came here, before I came out here [UNINTELLIGIBLE] |
| CARTWRIGHT: | Okay, well, shit. Hold on one second, bro'. Let me, uh, check this traffic first. So, uh… Well, shit. It's, it's, uh, same spot where you gave it to me at. So you might as well just meet me there. |

| | |
|---|---|
| BOOKER: | Alright. Alright. |
| CARTWRIGHT: | Yep. You just gotta give me, uh, just give me a minute, cause I'm headed that way. |
| BOOKER: | Alright. |
| CARTWRIGHT: | Alright. I'll see you in a minute. |
| BOOKER: | Alright. |
| CARTWRIGHT: | Yep. |

78.     Based on the ongoing investigation, my training and experience and the intercepted phone call, I believe BOOKER was trying to meet with CARTWRIGHT in order to obtain money to pay JOHNSON for drugs, prior to traveling to Detroit, Michigan to meet with him.

79.     At approximately 2:49 p.m., investigators observed the gray Durango pull into the driveway at Cartwright's residence. At approximately 3:16 p.m., investigators observed CARTWRIGHT's blue Lexus sedan pull into Cartwright's residence. A short time later, investigators drove past Cartwright's residence, and did not see anyone in the vehicles. At approximately 3:30 p.m., investigators observed the gray Durango pull out of Cartwright's residence. Investigators were unable to relocate the gray Durango after it left.

80.     Based on the intercepted call (Call #2126) and the physical surveillance, I believe that CARTWRIGHT provided money to BOOKER at Cartwright's residence for BOOKER to then take to JOHNSON to pay for drugs that he had previously fronted them. Based on CARTWRIGHT's statement that he was at the "same spot where you gave it to me at. So you might as well just meet me there," I believe that BOOKER had previously delivered the drugs to CARTWRIGHT at Cartwright's residence after getting them from JOHNSON.

81.     At approximately 4:10 p.m., investigators observed the gray Durango on eastbound I-96 near exit 67.

82.     At approximately 6:00 p.m., investigators observed BOOKER's gray Durango exit onto 7 Mile road from M-10.  The gray Durango traveled to Marlowe Ave, Detroit, Michigan, and parked facing north across from 18981 Marlowe St, Detroit, Michigan. Investigators then observed BOOKER exit the front passenger seat and make contact with an unknown black male on the sidewalk in front of 18981 Marlowe Ave. Approximately five minutes later, BOOKER walked back to the front passenger seat of the gray Durango and the unknown black male walked back towards a residence in the area of 18981 Marlowe Ave. At approximately 6:18 p.m., the gray Durango drove away.

83.     At approximately 6:30 p.m., investigators observed the gray Durango travel to a strip mall and park near the Midwest Grille located at 3246 W. Davison St., Detroit, MI. At approximately 6:33 p.m., the gray Durango travelled to a CVS located at 12707 Dexter Ave, Detroit, MI briefly before returning to the parking lot near the Midwest Grille. At approximately 6:48 p.m., a Chrysler Pacifica, bearing Michigan plate: EGW-3965 arrived and parked in the same plaza parking lot. An unknown black male, later identified as Devonte SMITH, walk up to the driver's side of the gray Durango. After a brief conversation, SMITH entered the Midwest Grill, then exited the Midwest Grill, entered the Chrysler Pacifica and departed. Shortly thereafter, investigators observed an unknown black male arrive on foot from an unknown location, speak to the passenger of the gray Durango through the open window and then depart on foot. Shortly thereafter, investigators observed the gray Durango depart the plaza parking lot. Following the exit from the plaza parking lot, surveillance continued with the gray Durango.

84.     At approximately 7:35 p.m., investigators observed BOOKER arrive at 17363 Freeland, Detroit, Michigan, in the gray Dodge Durango and park behind a Chrysler vehicle. At approximately 7:39 p.m., BOOKER exited the gray Durango and walked up to the porch of the residence. At approximately 7:43 p.m., BOOKER and JOHNSON were talking in the driveway of

the residence. At approximately 7:53 p.m., BOOKER walked to the gray Durango, opened the front passenger door and then walked back toward JOHNSON. JOHNSON opened the trunk of JOHNSON's vehicle, rummaged through it briefly and handed an unidentified item to BOOKER. BOOKER walked back to the gray Durango and JOHNSON walked back to the residence. At approximately 7:54 p.m., BOOKER left the area in the gray Durango and JOHNSON entered the residence.

85.     DEA Grand Rapids and the GRPD maintained surveillance on the Dodge Durango until, at approximately 10:05 p.m., it arrived at Booker Residence 1A. Investigators observed a black female exit the driver's seat of the vehicle, carrying an unknown object within a bag, and walk into the apartment. Investigators observed then observed BOOKER exit the front passenger side of the vehicle, begin manipulating objects on both the passenger and driver's side of the vehicle, and then walk toward the front entrance of the apartment. Approximately 15 seconds later, investigators observed BOOKER walk back to the gray Durango, get into the driver's seat of the vehicle, and back the vehicle into a parking spot to the north of where the vehicle was originally parked at. After approximately three minutes, he drove the Durango out of the parking lot.

86.     Based on the ongoing investigation, my training and experience, the intercepted phone calls, the physical surveillance, I believe that BOOKER traveled to Detroit, Michigan and met with JOHNSON in order to provide him a payment for the narcotics that were previously fronted to BOOKER for CARTWRIGHT. I further believe based on the physical surveillance of JOHNSON handing BOOKER an object that BOOKER obtained more narcotics from JOHNSON that he brought into Booker Residence 1A.

**K.  Identification of MYKAEL BOOKER as an associate of JAMES MOORE.**

87.     On October 21, 2020 at approximately 12:20 p.m., Aliyah Walker, contacted Kentwood Police department and reported that her rental vehicle, a gray 2020 Dodge Durango

bearing Illinois registration: E918648, had been stolen. This is the same vehicle that BOOKER used to obtain narcotics from JOHNSON in Detroit, Michigan on October 12, 2020, as described above.

88.     During an interview with the Kentwood Police Department, Aliyah Walker advised that on October 21, 2020, she ran into her apartment to use the bathroom and was on the phone. Walker advised that the vehicle was left running, unlocked and the keys inside the vehicle. Walker advised that 20 minutes later she came out and the vehicle was gone.

89.     On October 22, 2020. at approximately 11:45 p.m., a federal GPS ping on Target Phone 5, showed that it was in the area of Moore Residence.[17]  Investigators checked that area and located an unoccupied 2020 Durango on the south side of the parking lot of Moore Residence with no license plate. Investigators verified the VIN on the gray 2020 Durango matched the vehicle that had been reported stolen. Investigators requested that the Durango be impounded.

90.     Investigators searched the Durango before returning it to Avis. On the backseat of the Durango was a dry-cleaning bag containing a pair of jeans. The name on the dry-cleaning receipt was BOOKER with a phone number of Target Phone 5. Investigators also found Dennis CARTWRIGHT's Auto Den business card and the Avis rental agreement in the Durango.

91.     In October 2020, investigators conducted a phone toll analysis of Target Phone 5. Between the dates of September 21, 2020, and October 11, 2020, the phone analysis revealed that Target Phone 5 had approximately 26 phone calls with MOORE PHONE A. Further, since the activation of BOOKER's GPS ping on October 15, 2020, investigators have observed BOOKER's GPS ping to be in the area of the Muffler Man Premises on at least two occasions.

92.     Based on the ongoing investigation, my training and experience, GPS ping data,

---

[17] On October 14, 2020, U.S. Magistrate Judge Phillip Green authorized a ping warrant on Target Phone 5 for a period of 30 days.

phone toll analysis, and the recovery of the Durango outside of Moore Residence after returning from the transaction with JOHNSON in Detroit, I believe that BOOKER is a narcotics associate of MOORE.

**L. JOHNSON meets with CARTWRIGHT at Cartwright's residence to collect drug proceeds.**

93.     On October 27, 2020, at approximately 5:04 p.m., CARTWRIGHT, using Target Phone 3, had a call (Call #2528) with JOHNSON, using JOHNSON PHONE B.

| | |
|---|---|
| JOHNSON: | Yo. |
| CARTWRIGHT: | What's happening? |
| JOHNSON: | Hello? |
| CARTWRIGHT: | Yo, what's going on? |
| JOHNSON: | Not shit. 'Bout twenty minutes from y'all. |
| CARTWRIGHT: | Yeah, did you ever talk to him? |
| JOHNSON: | Yeah, I did. I did. I talked to him.  I talked to him.  Uh, I… He was trying to come down yesterday, but it got late, so I'm, um, trying to let him know… |
| CARTWRIGHT: | Shit, I, I still ain't talked to him. He still ain't called me. |
| JOHNSON: | Listen. Do me a favor, cause I can't text him from, uh, that phone that I got him on. |
| CARTWRIGHT: | Yeah. |
| JOHNSON: | Just text him and tell him, um, to call me right now.  I'm about to pull in. I need to know where to go. |
| CARTWRIGHT: | Alright. |
| JOHNSON: | Tell him I'm 'bout to pull in. I don't know where to go. |
| CARTWRIGHT: | Alright.  Yep. |

94.     Based on the ongoing investigation, my training and experience, and the intercepted

phone call, I believe that JOHNSON was traveling to Grand Rapids, Michigan to collect narcotics payments from BOOKER and CARTWRIGHT. I believe that CARTWRIGHT and JOHNSON were still unable to contact BOOKER

95.    At approximately 7:24 p.m., CARTWRIGHT, using Target Phone 3, had a call (Call #2538) with JOHNSON, using JOHNSON PHONE B.

| | |
|---|---|
| CARTWRIGHT: | Yo. |
| JOHNSON: | What's up though fam? Hey, text me your address. I'm 'bout to slide over there. |
| CARTWRIGHT: | Shit… Man, what nigg… Why you can't remember shit? Man, where… Man, where did old boy live… |
| JOHNSON: | I told you that other phone… It's a new phone, bro. |
| CARTWRIGHT: | Oh. |
| JOHNSON: | This is a new phone. |
| CARTWRIGHT: | Hey. Tell him, um… Man, where… Man, where is Mike ass at? |
| JOHNSON: | I don't know. Honestly, I'm a beat Mike ass if I see you and don't see him. If I see you and don't hear from him by then… I just told my man that. I'm, I'm getting on his ass, bro. I'm tired of this shit. Niggas will drink, partying all night and… |
| CARTWRIGHT: | He ain't…. |
| JOHNSON: | He probably up with one of these old nasty ass broads, man. |
| CARTWRIGHT: | Yea, but he ain't ca… He ain't a… He ain't called me or answered the phone since, since then. Where you at right now? |
| JOHNSON: | Right. Uh, I'm like, Griggs and… I'm over here by Vamps' spot over there, like, by Griggs and Hall. |
| CARTWRIGHT: | Oh, okay.  Alright. |

| JOHNSON: | So, I'll just take the business straight down. |
|---|---|
| CARTWRIGHT: | Yep. Well, yeah. Eastern straight down. |
| JOHNSON: | Okay. Eastern straight down. Okay. Okay. Give me a, uh… Give me the… Send me a text. I'm on my way now. |

96.    At approximately 7:26 p.m., CARTWRIGHT, using Target Phone 3, sent the following text message (Call #2539) to JOHNSON, using JOHNSON PHONE B: 7073 Eastern Ave.

97.    Based on my training and experience, as well as the ongoing investigation, I believe that CARTWRIGHT and JOHNSON were discussing their continued difficulty contacting BOOKER.  Because BOOKER was not available, JOHNSON was advising that he was on his way to Cartwright's residence to collect drug proceeds from CARTWRIGHT.

**M. Execution of Federal Search Warrants on December 1, 2020 and Seizure of Subject Vehicles 1 and 2.**

98.    On December 1, 2020, investigators executed search warrants on MOORE RESIDENCE (1:20-mj-490), the Muffler Man (1:20-mj-491), CARTWRIGHT RESIDENCE (1:20-mj-488), and Auto Den (1:20-mj-489).

99.    At approximately 6:00 a.m., investigators made entry into MOORE RESIDENCE. Police located MOORE in the west bedroom, and JAMIE LAFOREST and ARTHUR KITTS JR in the east bedroom.

100.   After waiving his *Miranda* rights, MOORE stated that LAFOREST and KITTS did not live at the apartment.  Investigators found paperwork and documents in the apartment the confirmed that MOORE did live there.

101.   Investigators further located and seized approximately $6,580 US currency, 52 grams of crack cocaine, 142 grams of heroin, 49.5 pills of Benzodiazepine, 1.2 grams of crack cocaine, 1 gram of cocaine, and 2 digital scales from the residence.

37

102.   At approximately 6:15 a.m., investigators made entry into 1246 Plainfield Ave NE, Grand Rapids, Michigan, the Muffler Man, owned and operated by JAMES MOORE.

103.   Investigators located and seized the following from inside the business: 88 grams of cocaine, 50 grams of marijuana, narcotics paraphernalia to include a press, spoon, scale and sandwich bags.

104.   At approximately 6:02 a.m., investigators made entry into 6993 Division South, Grand Rapids, Michigan, the Auto Den, owned and operated by DENNIS CARTWRIGHT.

105.   Investigators located and seized the following from inside the business: 57 grams of cocaine, a digital scale, and sandwich bags.

106.   At approximately 6:00 a.m., investigators made entry into 7073 Eastern Ave SE, Grand Rapids, Michigan, residence of DENNIS CARTWRIGHT.

107.   Investigators located and seized SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2, located inside the garage of the CARTWRIGHT RESIDENCE.

108.   SUBJECT VEHICLE 1 is not currently titled with the Michigan Secretary of State. The most recent registration for SUBJECT VEHICLE 1 is an Arizona registration for Jacob Voliner, who resides in Arizona that expired on March 15, 2019.  On December 16, 2020, Voliner told investigators that approximately four to six months ago, Voliner sold SUBJECT VEHICLE 1 to "Dennis." whom Voliner met through a mutual friend.  "Dennis" paid between $13,000 and $15,000 for SUBJECT VEHICLE 1.  "Dennis" paid Voliner for SUBJECT VEHICLE 1 with a cashier's check from a business that began with "Auto".

109.   SUBJECT VEHICLE 2 was purchased new from Wolf Kubota in Byron Center, Michigan on June 29, 2019 for $5,900 by CARTWRIGHT, using AUTO DEN as the purchaser. CARTWRIGHT paid for SUBJECT VEHICLE 2 with a credit card, ending in 4695. CARTWRIGHT regularly makes payments on credit cards from his Auto Den bank account.

110.   I have analyzed CARTWRIGHT's bank accounts, including  his personal accounts, and accounts held in the name of Auto Den, 851 Davis, Cartwright Construction, and Car Genie. The vast majority of deposits into all of these bank accounts were large, even number cash deposits, such as $4,000, $7,500, or $8,500.  These cash deposits were often made via an ATM, which allowed CARTWRIGHT to deposit large amounts of cash, believed to be drug trafficking proceeds, without being questioned by bank tellers. Analysis of the bank records for CARTWRIGHT show that these drug trafficking proceeds are deposited regularly and moved through CARTWRIGHT's other bank accounts in an attempt to make these funds appear as legitimate business income and/or to hide the true ownership of these funds.  Due to this money laundering activity, all of CARTWRIGHT's funds in all of his bank accounts are tainted by the drug trafficking proceeds that he continually runs through his bank accounts.  Therefore, since the majority of CARTWRIGHT's income is from drug trafficking, it is believed that SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2 were purchased with drug trafficking proceeds, or at the very least, comingled tainted funds.

111.   On November 7, 2020, MOORE told the owner of Cutlerville Small Engine and Marine (CSEM) that he had purchased SUBJECT VEHICLE 3 and was going to bring it to CSEM for winterization and winter storage. The owner of CSEM also knows MOORE by the name "Stretch".  CSEM received SUBJECT VEHICLE 3 between November 7, 2020 and December 1, 2020.  SUBJECT VEHICLE 3 is located at a storage lot owned and operated by CSEM.

112.   Analysis of MOORE's bank accounts including 851 Davis, Car Genie, K&J Muffler, and MOORE's personal accounts, show that MOORE receives drug trafficking proceeds through cash deposits and regular transfers between his accounts and the accounts owned and operated by CARTWRIGHT.  The analysis shows that these drug trafficking proceeds are deposited regularly and moved through CARTWRIGHT and MOORE's other bank accounts in an attempt to make

these funds appear as legitimate business income and/or to hide the true ownership of these funds. Due to this money laundering activity, all of MOORE's funds in all of his bank accounts are tainted by the drug trafficking proceeds that he continually runs through his bank accounts.  Therefore, since the majority of MOORE's income is from drug trafficking, it is believed that SUBJECT VEHICLE 3 were purchased with drug trafficking proceeds and/or comingled tainted funds.

113.    Based on the ongoing investigation, the physical surveillance, financial investigation outlined below, and the execution of the federal search warrants, I believe that MOORE and CARTWRIGHT used narcotics proceeds to purchase the SUBJECT VEHICLES.

114.    Moreover, MOORE has no verifiable income as described in his lack of tax returns for the State of Michigan for his personal income and has reported only gross sales for the tax year of 2019 as $13,798.86, with a gross payroll of $6,733.68 for the Muffler Man.

115.    Additionally, CARTWRIGHT has no verifiable legitimate income which could be used to purchase the assets, as described in his State of Michigan 2017 tax return and lack of 2018 tax return for the State of Michigan.

## APPLICABLE FORFEITURE LAW

116.    I am advised that 21 U.S.C. § 853(a)(1) provides for the criminal forfeiture of any property constituting, or derived from, any proceeds a person obtained, directly or indirectly from drug trafficking.  Title 21 U.S.C. § 853(f) authorizes the issuance of a seizure warrant for property subject to forfeiture under 21 U.S.C. § 853 if the court determines that probable cause exists that a restraining order under 21 U.S.C. § 853(e) would be insufficient to ensure the availability of the property for forfeiture in the event of conviction.  Due to the inherent mobility of vehicles and the ease with which they can be transferred or sold, I submit that probable cause exists that a restraining order under 21 U.S.C. § 853(e) would be insufficient to ensure the availability of the Subject Vehicles for forfeiture in the event of conviction.

117.    I am further advised that 21 U.S.C. § 881(a)(6) authorizes the civil forfeiture of all proceeds traceable to the exchange of controlled substances.  I am further advised that 21 U.S.C. § 881(b) authorizes the seizure of property subject to forfeiture under 21 U.S.C. § 881 in the same manner set forth in 18 U.S.C. § 981(b), which authorizes the seizure of property in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure.

118.    I am also advised that 18 U.S.C. 982(a)(1) provides for the criminal forfeiture of any property involved in, or traceable to, any violation or attempted violation of 18 U.S.C. 1956 or any conspiracy to commit such violation.   I am further advised that property subject to forfeiture in promotional money laundering offenses includes not only the illegal proceeds from the specified unlawful activity but also any clean money that has been commingled with the illegal proceeds that is used or attempted to be used in the financial transaction promoting the unlawful activity. *United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005).  Title 21 U.S.C. § 853(f), as incorporated by 18 U.S.C. § 982(b) authorizes the seizure of such property subject to criminal forfeiture under 18 U.S.C. § 982.  Furthermore, 18 U.S.C. 981(a)(1)(A) provides for the civil forfeiture of any property involved in a transaction or attempted transaction in violation of 18 U.S.C. 1956 or any property traceable to such property.  Title 18 U.S.C. § 981(b) authorizes the seizure of property subject to civil forfeiture under 18 U.S.C. § 981.

**CONCLUSION**

119.    Based upon the foregoing, probable cause exists to believe that all SUBJECT VEHICLES are property, which constitute or are derived from proceeds traceable to violations of 21 U.S.C. §§ 841(a)(1) (controlled substances act), a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(D) and 1961(1)(D), or a conspiracy to commit such offense, and are subject to seizure pursuant to 18 U.S.C. § 981(b) by 21 U.S.C. § 881(b) and 21 U.S.C. § 853(f), and are subject to civil forfeiture pursuant to 21 U.S.C. § 881(a)(6), and criminal forfeiture pursuant to 21 U.S.C.

§§ 853(a)(1), (a)(2); and are property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (concealment money laundering), or any property traceable to such property, are subject to seizure pursuant to 18 U.S.C. § 981(b) and 18 U.S.C. § 982(b),  and are subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and criminal forfeiture pursuant to 18 U.S.C. § 982(a)(1).